UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 20 CR 724 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| DEONTA T. CARSON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Deonta Carson is charged by indictment with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Doc. 1. Carson moves to suppress all evidence obtained from his March 2020 seizure and arrest as the fruits of an unlawful traffic stop. Docs. 28, 48. Pursuant to Criminal Rule 12(d), the court states its findings of fact and conclusions of law. Carson's motion is denied.

**Findings of Fact**

What follows is a description of the evidence submitted with the parties' briefs, Docs. 28, 33, 39, 48, 50, 51, and presented at an evidentiary hearing, Doc. 46. In summarizing the evidence and making findings of fact, the court considers the video and documentary evidence, as well as the testimony and demeanor of the witnesses who testified at the hearing, Officers Steven Nisivaco and Ryan Graal of the Chicago Police Department.

Officer Nisivaco testified as follows. On the afternoon of March 2, 2020, Officer Nisivaco was on "routine patrol" with his partner, Officer Graal. Doc. 48-2 at 19. The officers were riding in an unmarked squad car, each in full uniform and wearing a body camera. *Ibid.*; Doc. 28-2 (Officer Nisivaco's body camera footage); Doc. 28-3 (Officer Graal's body camera

1

footage). At about 3:15 p.m., the officers pulled Carson over for driving a car with an inoperable brake light. Doc. 48-2 at 19-20. The officers approached the car on foot, with Officer Nisivaco on the driver's side and Officer Graal on the passenger side. *Id*. at 20. Officer Nisivaco asked for Carson's driver's license, which Carson handed over along with his insurance information. *Ibid*. Officer Nisivaco then asked Carson whether he had a concealed carry license or a FOID card; whether there were any weapons in the car; and whether there was anything else illegal that Officer Nisivaco needed to know about. *Id*. at 24. Carson responded "no" to each question. *Ibid*.

Officer Nisivaco returned to the patrol car to run Carson's driver's license through the Law Enforcement Agency Database Systems ("LEADS") database. *Id*. at 8. The database revealed that Carson's license was current; issued a "caution file alert" that he was a gang member and currently on parole; and generated a page through the "hot desk" indicating that he had a prior gun offense and was required to register as a gun offender with the City of Chicago. *Id*. at 9. The database did not indicate the crime for which Carson was on parole or the nature of his gun offense. *Id*. at 9-10.

Less than two minutes after first pulling Carson over, *compare* Doc. 28-2 at 2:00 (officers first exiting their patrol car), *with id*. at 3:51 (Officer Nisivaco leaving the patrol car after searching the LEADS database), Officer Nisivaco returned to Carson's car and placed his driver's license and insurance information on the roof, Doc. 48-2 at 10. Officer Nisivaco testified that, at that point, he had not yet decided whether to issue Carson a ticket. *Id*. at 26.

Officer Nisivaco then spent about 30 seconds asking Carson questions about the information obtained from the LEADS database. *Id*. at 12; *compare* Doc. 28-2 at 4:01 (beginning of criminal history questioning), *with id*. at 4:30 (end of criminal history questioning).

2

He first asked Carson what he was on parole for, to which Carson responded, "vehicular hijacking." Doc. 28-2 at 4:01-06; Doc. 48-2 at 27. Officer Nisivaco then confirmed that Carson was not on parole for his prior gun offense and asked whether he was up to date on his gun offender registration, to which Carson responded that he had "just registered like a week ago." Doc. 28-2 at 4:07-12. Officer Nisivaco followed up by asking, "[W]hen did that happen?"—intending to refer to the date of the gun offense, Doc. 48-2 at 11—and Carson responded, "35th and Michigan," the address of the City's police headquarters, where gun offender registrations take place, *id*. at 12; Doc. 28-2 at 4:12-14. Officer Nisivaco again asked, "When did that happen?," at which point Carson paused, turned away, and started looking through some papers. Doc. 28-2 at 4:14-20; Doc. 48-2 at 13, 32. Still intending to refer to the gun offense, Doc. 48-2 at 15, Officer Nisivaco asked, "I mean, was it recent?," and Carson responded that it was, Doc. 28-2 at 4:21-23. Officer Nisivaco then sought to confirm that Carson was on parole for "agg[ravated] vehicular hijacking," which Carson erroneously confirmed—he in fact was on parole only for vehicular hijacking, Doc. 33 at 3 n.5—and again asked Carson if he had any weapons in the car, to which Carson responded in the negative, Doc. 28-2 at 4:24-30.

Officer Nisivaco then asked Carson to exit the car. Doc. 28-2 at 4:30-32; Doc. 48-2 at 16. At that moment, Officer Graal, who was on the passenger side, turned away to spit on the ground. Doc. 28-3 at 4:27-33. Carson asked Officer Nisivaco whether he had probable cause to order Carson out of the car, to which Officer Nisivaco responded that he had "reasonable suspicion to investigate further" because Carson was on parole for aggravated vehicular hijacking and a convicted gun offender. Doc. 28-2 at 4:32-58. When Carson continued asking why he was being asked to step out of the car, Officer Nisivaco opened the driver's side door. *Id*. at 4:58-5:06; Doc. 48-2 at 17. Carson depressed the accelerator, revving the engine, but the

3

car did not move because Officer Graal had entered the car from the passenger side and was preventing Carson from shifting into gear. Doc. 28-2 at 5:07-12; Doc. 28-3 at 5:03-08; Doc. 48-2 at 17.

Both officers tried to remove Carson from the car as he continued to depress the accelerator. Doc. 28-2 at 5:18-39; Doc. 28-3 at 5:08-38. During the struggle, Officer Nisivaco saw a gun emerge from underneath Carson's left leg. Doc. 48-2 at 17. Shortly thereafter, Officer Nisivaco succeeded in removing Carson from the car. Doc. 28-2 at 5:39-52. As he did so, he heard a gun hit the ground. Doc. 48-2 at 18. Officers later recovered the gun, which was loaded. *Ibid*. Carson was arrested for unlawful use of a weapon and resisting arrest, and was issued a traffic citation for the broken taillight. Doc. 28-1 at 5.

Officer Nisivaco testified that he had asked Carson how recent his gun offense was and what he was on parole for "to ensure that, you know, he's not armed or a danger to himself, us, or the public." Doc. 48-2 at 38. Officer Nisivaco also testified that he asked Carson to exit the car because "[h]is behavior had changed significantly from the first interaction to the second interaction." *Id*. at 12. Specifically, Officer Nisivaco testified that Carson, when asked about his criminal history, did not make consistent eye contact, was more nervous, and answered questions evasively. *Id*. at 12-13, 36, 38.

Carson argues that the video evidence undermines two aspects of Officer Nisivaco's testimony: first, that Officer Nisivaco asked Carson about his parole status and the date of his gun offense to ensure that he wasn't "a danger to himself, us, or the public," *id*. at 38; Doc. 48 at 7-9; Doc. 51 at 1-3; and second, that Officer Nisivaco ordered Carson to exit the car due to Carson's nervousness and evasiveness in answering questions, Doc. 48-2 at 12-13, 36; Doc. 48 at 9-10; Doc. 51 at 5-7. Specifically, Carson contends that the officers' actions and body language

4

during the stop show that they were not actually concerned about officer safety. According to Carson, if Officer Nisivaco had been concerned about safety, he should have issued a ticket after learning that Carson was on parole and had a prior gun offense—thus ending the interaction and limiting the risk of danger—instead of engaging him in a series of questions about his criminal history. Doc. 48 at 8; Doc. 51 at 2. Carson adds that Officer Nisivaco's decision to question him before deciding whether to issue a ticket is all the more inconsistent with a concern for safety given that Chicago Police Department's "8-Step Process for Officer Safety" instructs officers to decide whether to cite, warn, or arrest a driver after collecting a driver's license and insurance information. Doc. 51 at 2-3. Carson also submits that certain facts—that Officer Nisivaco did not ask him to exit the car before questioning him about his criminal history, Doc. 39 at 3-4; Doc. 48 at 8-9; Doc. 51 at 2; that Officer Nisivaco kept standing next to the open driver's side window after learning that he was on parole for vehicular hijacking, Doc. 48 at 9; and that Officer Graal turned his back to spit on the ground when Officer Nisivaco first asked him to exit the car, *ibid.*—show that Officer Nisivaco's questions were "wholly unrelated to officer safety and evinced [his] attempt to investigate whether criminal activity was afoot," Doc. 39 at 4.

Carson does not provide persuasive grounds to doubt the credibility of Officer Nisivaco's testimony. Officer Nisivaco testified that, at the time he returned to Carson's car, he had "not decided whether or not to issue him a ticket." Doc. 48-2 at 26. Consequently, the fact that he did not issue a ticket immediately on returning to Carson's car does not imply that he was unconcerned about his and Officer Graal's safety, but rather that he was not yet ready to issue a ticket. More generally, the fact that Officer Nisivaco did not immediately take the most aggressive safety precautions upon learning that Carson had prior convictions—such as ordering him to exit his car or restraining him—gives no basis to doubt the veracity of his testimony that

5

he was, in fact, concerned about the safety risks posed by Carson. While Carson believes that Officer Nisivaco's failure to order him out of the car indicated a lack of concern for safety, the more reasonable inference is that Officer Nisivaco's conduct reflected a considered decision not to escalate the situation unnecessarily while he was still gathering information about Carson's prior convictions. Finally, to the extent that Officer Graal's turning away from the car evinces a lack of concern for safety, there is no indication that Officer Nisivaco shared Officer Graal's assessment of the situation. Accordingly, particularly after observing Officer Nisivaco testify, the court finds credible his testimony that he questioned Carson about his prior offenses to "ensure that … he's not armed or a danger to himself, us, or the public." *Id*. at 38.

The court also finds credible Officer Nisivaco's testimony that he asked Carson to exit the car because "[h]is behavior had changed significantly from the first interaction to the second interaction," in that he no longer maintained consistent eye contact, seemed more nervous, and became evasive. *Id*. at 12-13, 36, 38. When Officer Nisivaco first asked Carson, "[W]hen did that happen"—intending, as noted, to refer to the date of the gun offense—Carson responded with a location rather than a date, "35th and Michigan." *Id*. at 11-12. And when Officer Nisivaco repeated the question, Carson paused, did not answer, and turned away to begin sifting through paperwork. *Id*. at 13; Doc. 28-2 at 4:14-21. Officer Nisivaco reasonably could have believed that Carson was evading his questions, and reasonably could have inferred from Carson's sudden preoccupation with his paperwork that he was nervous. While it is not readily apparent from the court's review of the video footage that Carson appeared nervous, the footage may not capture entirely all the subtleties of what a trained officer on the scene could have observed. Moreover, the footage clearly shows that, while Carson looked for and through his papers, he did not maintain eye contact with Officer Nisivaco, further substantiating Officer

6

Nisivaco's testimony. Doc. 28-2 at 4:14-30. Granted, Carson may have mistakenly thought that Officer Nisivaco was asking about the date of his gun offender registration, not the date of his gun offense, and Carson may have been searching for paperwork concerning his registration. But that does not affect the objective reasonableness of Officer Nisivaco's interpretation of Carson's observable behavior given that Officer Nisivaco believed he was asking about the date of the gun offense.

Carson argues that Officer Nisivaco's "perceptions of [his] nervous behavior should not be afforded weight" due to Officer Nisivaco's statement to Carson during the stop that the exit order was justified because he had "reasonable suspicion to investigate further." Doc. 51 at 6. But Officer Nisivaco was not required to reveal to Carson the true motivation for the exit order, *see Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that officers may conceal from motorists their "actual motivations" for stopping them), and there is no reason to think that, if Officer Nisivaco truly were concerned about safety, he would have so informed Carson. Officer Nisivaco's statement to Carson thus does not alter the court's conclusion that he credibly testified that he ordered Carson to exit the car due to his nervous and evasive behavior.

Officer Graal testified that he had a cordial conversation with Carson while Officer Nisivaco was running the driver's license, insurance, and criminal history checks in the patrol car, Doc. 48-2 at 41, 45; that he did not feel unsafe at that point, *id*. at 42; and that Carson's "whole demeanor change[d]" when Officer Nisivaco began questioning him about his criminal history, *id*. at 45. Given their respective roles in the underlying events, Officer Graal's testimony is far less material than Officer Nisivaco's.

7

## Conclusions of Law

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Traffic stops are seizures, so they must be reasonable under the circumstances." *United States v. Cole*, __ F.4th __, 2021 WL 5984977, at *3 (7th Cir. Dec. 17, 2021) (en banc) (citing *Whren*, 517 U.S. at 809). "Because traffic stops are typically brief detentions, more akin to *Terry* stops than formal arrests, they require only reasonable suspicion of a traffic violation—not probable cause"—to be reasonable. *Ibid.* (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "The government bears the burden of proving by a preponderance of the evidence that reasonable suspicion supported the traffic stop." *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020).

Just because a stop is "lawful at its inception" does not mean it remains lawful for the duration. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In particular, a traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of the stop. *Ibid.*; *see also Rodriguez*, 575 U.S. at 354 (explaining that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission,'" and that "[a]uthority for the seizure thus ends when tasks tied to the [mission] are—or reasonably should have been—completed") (quoting *Caballes*, 543 U.S. at 407); *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019) ("[A] stop justified only by a traffic violation becomes unlawful if it is prolonged beyond the time reasonably required to complete the stop's original mission.").

The parties agree that the stop here was constitutional up to the point when Officer Nisivaco returned to Carson's car after completing the LEADS database search. Doc. 28 at 6; Doc. 33 at 5; Doc. 48 at 7-8 n.3. Carson argues that, after that point, Officer Nisivaco unlawfully extended the stop in two ways: first, by inquiring into his criminal history; and second, by

8

ordering him to exit the car. Docs. 28, 39, 48, 51. The Government argues that both actions were permissible safety precautions and therefore that they did not violate the Fourth Amendment. Docs. 33, 50.

I.      **Criminal History Questions**

Carson contends that Officer Nisivaco's criminal history questions—concerning the offense for which he was on parole, whether he had registered as a gun offender, and the date of his gun offense—were "wholly unrelated to officer safety" and instead were "aimed at investigating whether [he] was committing additional crimes at the time of the stop." Doc. 39 at 3-4; Doc. 48 at 3, 7-9; Doc. 51 at 1-3. Thus, Carson maintains, because the officers did not have independent reasonable suspicion that he was engaged in criminal activity (other than driving a car with an inoperable brake light), Officer Nisivaco's criminal history questions impermissibly extended the stop. Doc. 28 at 6-7; Doc. 39 at 3-5; Doc. 48 at 7-13; Doc. 51 at 1-5. The Government responds that Officer Nisivaco's brief criminal history questioning was motivated by the need to "clarify information he received, which related to officer safety and [Carson's] compliance with his gun registration requirement, a public safety measure," and thus did not unreasonably extend the stop. Doc. 50 at 3; Doc. 33 at 1, 6-8.

As noted above, a traffic stop may last only as long as is "reasonably required" to complete the stop's "mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez,* 575 U.S. at 354 (internal quotation marks and citation omitted). Safety concerns falling within the scope of the stop's mission include "ordinary inquiries incident to the stop[,] such as questions involving the driver's license, the vehicle's registration, and whether there are outstanding warrants for the driver," all of which are "related to the mission and objective of enforcing the traffic code, and 'ensuring that vehicles on the road

are operated safely and responsibly.'" *United States v. Stewart*, 902 F.3d 664, 672 (7th Cir. 2018) (quoting *Rodriguez*, 575 U.S. at 355).

In addition, "[b]ecause traffic stops are 'especially fraught with danger to police officers,' an officer may also take 'certain negligibly burdensome precautions in order to complete his mission safely,'" *ibid*. (quoting *Rodriguez,* 575 U.S. at 356), such as running "criminal record and outstanding warrant checks," *Rodriguez,* 575 U.S. at 356 (favorably citing *United States v. Holt*, 264 F.3d 1215, 1221-22 (10th Cir. 2001)). *See Utah v. Strieff*, 579 U.S. 232, 241 (2016) ("The officer's decision to run the warrant check was a negligibly burdensome precaution for officer safety.") (internal quotation marks and alteration omitted); *United States v. Simon*, 937 F.3d 820, 833 (7th Cir. 2019) ("[W]hen police conduct a stop, they are entitled to demand the driver's identification, of course, and it is routine to check the driver's record for active warrants, driving history, and criminal history. Those checks are done for important reasons, including officer safety.") (internal quotation marks omitted). In *Holt*, the Tenth Circuit articulated the officer safety rationale for running criminal history and warrant checks, explaining that, "[b]y determining whether a detained motorist has a criminal record or outstanding warrants, an officer will be better appri[s]ed of whether the detained motorist might engage in violent activity during the stop." *Holt*, 264 F.3d at 1221-22; *see also United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996) ("The results of a criminal history check could indicate whether further back-up or other safety precautions were necessary."). In contrast to precautions taken to safely complete the traffic stop, "[o]n-scene investigation into other crimes … detours from th[e] mission" and improperly extends the stop. *Rodriguez,* 575 U.S. at 356-57; *see also Cole*, 2021 WL 5984977, at *3 ("Police may not 'detour' from that 'mission' [of a traffic stop] to investigate other criminal activity. A detour that 'prolongs the stop' violates the Fourth Amendment unless the officer has

10

reasonable suspicion of other criminal activity to independently justify prolonging the stop.") (quoting *Rodriguez,* 575 U.S. at 355-57) (alterations omitted).

Evaluated against this legal backdrop, Officer Nisivaco's questions about the offense for which Carson was on parole and the recency of his gun offense were permissible, "negligibly burdensome precautions" taken to ensure officer safety. *Rodriguez,* 575 U.S. at 356. Officer Nisivaco credibly testified that he questioned Carson about his prior offenses to "ensure that … he's not armed or a danger to himself, us, or the public." Doc. 48-2 at 38. By asking those questions, which added approximately 30 seconds to the stop, Officer Nisivaco learned that Carson was on parole for vehicular hijacking and that his other prior gun offense was "recent." *Id.* at 15. The rationale for allowing criminal history checks during a traffic stop—that knowledge of a motorist's prior convictions allows the officer to better assess the potential safety risks the motorist poses, *see Holt*, 264 F.3d at 1221-22; *Fink*, 85 F.3d at 1280—applies with equal force to follow-up questions eliciting information about the nature and recency of those convictions. Officer Nisivaco's brief questions concerning the offense for which Carson was on parole and the recency of his gun offense were thus permissible precautions taken "to complete [the] mission safely." *Rodriguez,* 575 U.S. at 356; *see also United States v. Thompkins*, 833 F. App'x 648, 649-51 (7th Cir. 2020) (noting that the officer ran a four-minute database check on the motorist, learned that he had prior convictions for unlawful use of a weapon, and asked him about his prior weapons convictions, and upholding the stop's constitutionality without commenting on the officer's criminal history questioning).

Officer Nisivaco's question concerning Carson's gun offender registration status—"Are you up to date on your registration?", Doc. 28-2 at 4:08-09—also related to officer safety. Carson's compliance with the City's gun offender registration requirement is indicative of his

11

compliance with gun-related regulations in general, including the prohibition on possessing a firearm as a felon. Officer Nisivaco's asking Carson whether he was up to date on his registration was therefore permissible as part of his assessment of the safety risks that Carson posed. And because that inquiry was a "negligibly burdensome precaution[]" taken "to complete [the] mission safely," it did not violate the Fourth Amendment. *Rodriguez,* 575 U.S. at 356.

## II. Order to Exit the Car

Carson next argues that Officer Nisivaco's exit order was "unrelated to safety, and [was] for purposes of investigation into criminal activity," and therefore that it impermissibly extended the stop because it was not supported by independent reasonable suspicion. Doc. 48 at 3, 9-13; Doc. 28 at 7-9; Doc. 39 at 6; Doc. 51 at 5-7. The Government responds that, as a general rule, exit orders are justified during an ongoing traffic stop due to officer safety concerns, "regardless of [the officer's] state of mind." Doc. 33 at 10-11. The Government also argues that Officer Nisivaco asked Carson to exit the car because he had "sensed defendant's nervousness the second time and determined that he was a possible danger." Doc. 50 at 6.

In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the Supreme Court held that an officer conducting a traffic stop may order the driver to exit a vehicle. *Id*. at 111 n.6 ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."); *see also United States v. Johnson*, 874 F.3d 571, 573 (7th Cir. 2017) ("[O]fficers making a traffic stop on probable cause may require a car's occupants to get out.") (paraphrasing *Mimms*, 434 U.S. at 111 n.6). Although the rule announced in *Mimms* was based on the Court's determination that "the government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle," *Rodriguez,* 575 U.S. at 356 (quoting *Mimms*, 434 U.S. at 110-11),

12

its application does not turn on whether the officer was in fact subjectively concerned for his safety, *see Lewis*, 920 F.3d at 492 ("During a valid traffic stop, an officer may legitimately ask [a driver] to step out of his car, even without any particularized suspicion … .") (internal quotation marks omitted). Indeed, in *Mimms* itself, the Court upheld an exit order where the officer "freely concede[d]" that he had "no reason to suspect foul play from the particular driver at the time of the stop … ." *Mimms*, 434 U.S. at 109.

While an exit order is permissible regardless of the officer's subjective safety concerns, such an order still can violate *Rodriguez* if "the stop is prolonged in a 'detour' from its traffic-related mission," at which point "the safety rationale for an order to leave the car dissipates, unless the order is justified by an independent rationale compatible with the Fourth Amendment." *Thompkins*, 833 F. App'x at 650 (quoting *Rodriguez*, 575 U.S. at 356-57). However, so long as "the traffic-related purpose [of the stop] [i]s still legitimately ongoing[,] … th[e] case falls within the rule of *Mimms*, where officer safety justifies ordering a driver from a car during a genuinely unconcluded investigation." *Ibid*.

Under *Mimms* and *Rodriguez*, Officer Nisivaco's exit order was permissible, regardless of his subjective intentions in issuing the order, because it was made before the stop's traffic-related purpose ended. At the time of the exit order, Officer Nisivaco had not yet decided whether to issue a ticket and had just finished questioning Carson about his criminal history. Doc. 48-2 at 16, 26. As explained, that questioning was part of the stop's legitimate mission. It follows that the traffic-related purpose of the stop was still "legitimately ongoing" when Officer Nisivaco ordered Carson to exit, making the order permissible. *See Thompkins*, 833 F. App'x at 650 (holding that an exit order was permissible where the officer had not yet handed back the defendant's driver's license and registration, had just finished questioning him about previous

convictions disclosed in a criminal history database search, and had not yet determined whether to issue a ticket).

Although it is unnecessary to do so, the court adds for good measure that, even if *Mimms* and *Rodriguez* require an officer's exit order to be subjectively motivated by officer safety concerns, Officer Nisivaco's exit order would remain constitutional. Officer Nisivaco credibly testified that he ordered Carson to exit the car due to his nervous and evasive behavior, meaning that the order was motivated by Officer Nisivaco's concern for his and his partner's safety. There is no question that an exit order motivated by legitimate officer safety concerns falls within the scope of a traffic stop's mission and is permissible under the Fourth Amendment. *See Rodriguez,* 575 U.S. at 349 (describing *Mimms* as reasoning that "the government's 'legitimate and weighty' interest in officer safety outweigh[s] the '*de minimis*' additional intrusion of requiring a driver, lawfully stopped, to exit a vehicle") (quoting *Mimms*, 434 U.S. at 110-11).

## Conclusion

The court finds by a preponderance of the evidence that Officer Nisivaco did not impermissibly prolong Carson's traffic stop, either by questioning him about his criminal history or by ordering him to exit his car. Because Officer Nisivaco did not violate Carson's Fourth Amendment rights, Carson's motion to suppress is denied.

December 22, 2021

_____
United States District Judge